UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Nos. 08 CV 2203 |
| | ) | 99 CR 43 |
| | ) | |
| BERNARD O'HALLAREN | ) | Judge William J. Hibbler |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO VACATE SENTENCE**

Defendant Bernard O'Hallaren III has filed a motion to vacate his sentence claiming that this Court failed to determine at his January 14, 2008 sentencing "whether or not the defendant admitted the violation and then enter a finding of 'a factual basis' for his plea." This Court has requested that the government respond to the defendant's motion. Simply put, the defendant's motion is frivolous. The defendant's claim is procedurally barred, is inconsistent with the mandate of the Court of Appeals for the Seventh Circuit (Seventh Circuit) and is unsupported by the record. The government respectfully requests that the motion to vacate the defendant's sentence be denied.

I.    Brief Procedural History

On February 20, 2007, United States District Court Judge George W. Lindberg revoked the defendant's supervised release based on his admissions to five violations of his supervised release. See Government Exhibit A at 2-3. [1] The defendant through counsel had admitted these violations at a hearing on February 14, 2007. See Government Exhibit B at 15-16 . These violations were: (1) failure to report to the probation officer and to submit a truthful written report; (2) failure to

---

[1]    Government Exhibit A is a copy of the transcript from the sentencing hearing held before Judge Lindberg on February 20, 2007. Government Exhibit B is a copy of the transcript of the sentencing hearing held before Judge Lindberg on February 14, 2007.

participate in a drug aftercare program as directed; (3) unlawfully using cocaine; (4) failure to submit to mandatory drug testing; and (5) failure to follow the instructions of the probation officer.

The district court asked defense counsel in the presence of the defendant if the defendant acknowledged all five violations. See Government Exhibit B at 15-16. Defense counsel responded, "He does. Could I just see - - - there's a factual issue with - - -" Id. The district court then proceeded to inquire about each particular violation. Id. Defense counsel confirmed that the defendant acknowledged committing each of the five violations. Id. Based on these admissions, the district court sentenced the defendant to 28 months' in prison. Government Exhibit A at 2, 3, 6.

On October 2, 2007, the Seventh Circuit vacated this sentence and remanded the case for resentencing before another district court judge. United States v. O'Hallaren, 505 F.3d 633, 634, 363-637 (7th Cir. 2007). The appeal was decided on the narrow ground that the defendant was not provided a sufficient opportunity to allocute at his sentencing hearing. Id at 636.

The case was reassigned to this Court for resentencing. The resentencing hearing began on January 11, 2008 and concluded on January 14, 2008. This Court, after providing the defendant with an opportunity to fully allocute, resentenced the defendant to 14 months' in prison with credit for time served to be followed by 3 months' of supervised release – all of which supervised release was to be served at the Salvation Army with drug aftercare.

Neither the defendant nor his counsel objected to the manner in which the sentence was imposed nor to the sentence itself. Although this Court explained to the defendant on January 11th and again on January 14th his right to appeal, no appeal was filed. See Government Exhibit D at 16

2

and Government Exhibit E at 27.[2]  In fact, the defendant thanked this Court at both hearings for the sentence he received.  See Government Exhibit D at 26 and Government Exhibit E at 9.

Nonetheless, upon the defendant's release from custody to begin serving the supervised release portion of his sentence, he chose to flee rather than to report to the Salvation Army.  A bench warrant was issued for his arrest on January 16, 2008.  On March 5, 2008, the defendant was located and arrested.

On March 26, 2008, this Court revoked the defendant's supervised release and sentenced him to nine months' in prison.  This is the sentence the defendant is currently serving.

On April 17, 2008, the defendant filed the subject motion to vacate his sentence entered on January 14, 2008.  The defendant also filed a motion seeking to stay his March 26th sentence, but that motion was denied by this Court on April 16, 2008.

II.    Procedural Default

The defendant did not appeal any aspect of the January 14, 2008 sentencing.  A Section 2255 motion to vacate a sentence is not a substitute for a direct appeal.  Varela v. United States, 481 F.3d 932, 935 (7th Cir. 2007);  Theodorou v. United States, 887 F.2d 1336, 1339 (7th Cir. 1989). " An issue not raised on direct appeal is barred from collateral review absent a showing of both good cause for and actual prejudice resulting from the failure to raise it." Mankarious v. United States, 282 F.3d 940, 943 (7th Cir. 2002); Prewitt v. United States, 83 F. 3d 812, 186 (7th Cir. 1996).  The combination of the defendant's intentional flight with claims unrelated to the resentencing mandated by the Seventh Circuit doom his ability to demonstrate either cause or prejudice to the extent any of

---

[2]    Government Exhibit D is a partial copy of a transcript of the sentencing hearing before this Court on January 11, 2008.  Government Exhibit E is a copy of a partial transcript of the sentencing hearing before this Court on January 14, 2008.

his claims are constitutional in nature.  His claims made pursuant to Section 2255 should therefore be procedurally barred.  See Ballinger v. United States, 379 F.3d 427, 429 (7th Cir. 2004) (claim that plea was involuntary barred for raising it for the first time in a Section 2255 motion).

III.    Claims Inconsistent with Mandate

The Seventh Circuit remanded the case to the district court "for resentencing".  See Government Exhibit C.  The defendant's claims do not relate to his January 14, 2008 resentencing, but rather to the original revocation of his supervised release by Judge Lindberg.  This Court complied fully with the Seventh Circuit's directions on remand and there was no error in this Court's execution of those directions.

IV.    Unsupported By Record

The defendant's claim that his admissions were somehow qualified or conditional is unsupported by the revocation hearings record.  There is nothing in the hearings transcripts indicating that the admissions made by the defendant's counsel in the defendant's presence to each of the violations charged in the United States Probation Office's Special Report were anything other than unequivocal and unconditional.  See Government Exhibit B at 15-16.  There was no "agreement" binding on the Court and the Court was free to choose any of the interested parties' recommendations or fashion its own sentence.[3]  The district court's choice of the Probation Office's recommendation did not impact the admissions underlying the revocation finding.

The defendant's assertion that he would have sought an evidentiary hearing is disingenuous.

---

[3]    To the extent there was arguably any "agreement", it was in the mutuality of the appropriate sentencing recommendations being made by the government and the defendant. Nothing in the mutuality of the government's and the defendant's sentencing recommendations bound the district court.

The defendant made no claim of innocence during his extensive allocution before this Court, but rather was apologetic toward everyone including the Probation Officer.  (See Government Exhibit D at 13-17).  The defendant has not made a claim of innocence since then.  How could he in light of testing positive for cocaine within days of being released from prison, in light of his total lack of cooperation with the Probation Office and in light of his having to be located and arrested in November 2006 in order to have his revocation hearing before Judge Lindberg?

Finally, the defendant's Rule 11 claim that Judge Lindberg and later this Court failed to make a finding of a factual basis for his "plea" is misguided.  First, as detailed above, the case was only before this Court for resentencing.  Second, Rule 11 of the Federal Rules of Criminal Procedure does not apply to supervised release revocation hearings.  United States v. LeBlanc, 175 F.3d 511, 516-517 (7th Cir. 1999); United States v. Pelensky, 129 F.3d 63, 68 (2nd Cir. 1997); see also United States v. Segal, 549 F.2d 1293, 1300 (9th Cir. 1977) (making of admissions at a probation revocation proceeding is not the equivalent of a guilty plea and the protections of Rule 11 do not apply.)

V.     <u>Conclusion</u>

Based on the foregoing, the government respectfully requests that the defendant's motion to vacate his sentence be denied.[4]

                              Respectfully submitted,

                              PATRICK J. FITZGERALD
                              United States Attorney

                    By:     /s/Edward G. Kohler_____
                              EDWARD G. KOHLER
                              Assistant United States Attorney
                              219 S. Dearborn - 5th Floor
                              Chicago, Illinois   60604
                              (312) 353-4086

_____

[4]     The government apologizes for filing this response late.  Even though the defendant's motion was frivolous, prudence dictated that the government obtain the necessary transcripts before responding.  The government respectfully requests this Court's permission to file instanter.  The government, of course, has no objection to the defendant being given additional time in which to reply.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned Assistant United States Attorney hereby certifies that the following document:

### GOVERNMENT'S RESPONSE TO DEFENDANT'S
### MOTION TO VACATE SENTENCE

was served on July 3, 2008, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to the following filers:

> Bernard J. O'Hallaren, III
> FCI
> P.O. Box 1000
> Oxford, WI 53952

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

BY:    /s/Edward G. Kohler
EDWARD G. KOHLER
Assistant United States Attorney
United States Attorney's Office
219 S. Dearborn - 5th Floor
Chicago, Illinois   60604
(312) 353-4086

7

1

CLERK'S FILE COPY

```
 1                  IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION
                                        07 - 1559
 3     UNITED STATES OF AMERICA,
                                       )
 4                  Plaintiff,         )    No.  99 CR 43
                                       )
 5          v.                         )    Chicago, Illinois
                                       )
 6     BERNARD J. O'HALLAREN,          )    February 20, 2007
                                       )    9:08 AM
 7                  Defendant.         )

 8                       TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE GEORGE W. LINDBERG
 9
       APPEARANCES:
10
       For the Plaintiff:       HON. PATRICK J. FITZGERALD
11                              U.S. ATTORNEY
                                219 S. Dearborn Street
12                              Fifth Floor
                                Chicago, IL 60604
13                              BY:  MR. EDWARD G. KOHLER
                                (312) 453-4086
14
       For the Defendant:       DURKIN & ROBERTS
15                              53 West Jackson Street
                                Suite 615
16                              Chicago, Illinois 60604
                                BY:  MR. THOMAS DURKIN
17                              Mr. ANTHONY W. HILL
                                (312) 913-9300
18
       Court Reporter:          Carol Raber
19                              219 S. Dearborn
                                Room 667
20                              Chicago, Illinois
                                (312) 446-6926
21
22
23
24
25
```

DOCKETED
APR 0 5 2007

U.S.C.A. - 7th Circuit
FILED
APR 09 2007   DW
GINO J. AGNELLO
CLERK
DOC. # _____

FILED
APR  2 2007
MICHAEL W. DOBBINS
CLERK, U. S. DISTRICT COURT

GOVERNMENT
EXHIBIT
A

81-3

1          THE CLERK:  99 C 43, USA versus Bernard O'Hallaren.

2          MR. KOHLER:  Good morning, your Honor.  Ed Kohler on

3     behalf of the United States.

4          MR. DURKIN:  Good morning, Judge.  Tom Durkin and Tony

5     Hill on behalf of the defendant, who is present.

6          MS. PRUITT:  Good morning, your Honor.  Bonnie Pruitt on

7     behalf of US Probation.

8          THE COURT:  Okay, I think we're ready to roll.

9          On April 13th of 2000, the defendant was sentenced on

09:08AM 10    two counts of transportation of stolen motor vehicles in violation

11    of 18 United States Code, Section 2312.  His sentence was 96 months

12    on each count, to be served concurrently; 36 months of supervised

13    release; $149,967.12 in restitution; a $200 special assessment; and

14    ordered to participate in a drug treatment program.

15         In 2005, while in the final months of his sentence at

16    the Salvation Army Work Release Center, the defendant escaped.  He

17    was taken back into custody and his good time credit was revoked.

18         Mr. O'Hallaren is now before the Court on allegations

19    that he violated the terms of his supervised release and that he,

09:09AM 20    1) failed to report to the probation officer and submit a truthful

21    written report within the first five days of each month; 2) failed

22    to participate in a drug after-care program as directed; 3)

23    unlawfully used a controlled substance; 4) failed to submit to

24    mandatory drug testing; and 5) failed to follow the instructions of

25    the probation officer.

1          At the hearing on this matter in open court, defendant

2     and his counsel admitted each of these violations.  And on the

3     basis of these five admitted violations of the conditions of

4     supervised release, the Court revokes defendant's supervised

5     release.

6          There is thus presented to the Court the question of

7     what sentence should be imposed on the defendant.  Defense counsel

8     argues for more supervised release, only this time with a custodial

9     component with Cornell Interventions.

09:10AM 10          The government agrees with defendant and also recommends

11     the Cornell Interventions program along with certain other

12     conditions and a strong admonition to the defendant that this is

13     his last chance.

14          The probation officer is recommending against the

15     Cornell Interventions program and instead is of the view that the

16     defendant should be sentenced to prison following the revocation of

17     the supervised release.

18          The defendant has presented testimony as to the merits

19     of this organization and program, and it does appear to the Court

09:11AM 20     to be a fine drug treatment program.  It claims a 15 percent

21     success rate.  But the testimony was that the success rate is in

22     line with other drug treatment programs.  The Court does not doubt

23     that Cornell Interventions is a good program, but does doubt that

24     it is appropriate for Mr. O'Hallaren.

25          The Court's doubts as to the advocacy of the recommended

1    program for Mr. O'Hallaren spring largely from his criminal

2    history.   Reviewing just his convictions:

3              In 1981, at the age of 19, he was arrested for and

4    subsequently convicted of possession of a controlled substance in

5    Florida;

6              In 1983, he was arrested and in 1984 convicted of

7    unauthorized use of a motor vehicle in Philadelphia.

8              In 1989, the defendant was 27 and had a big year in

9    DuPage County where he was arrested in three cases of deceptive

09:12AM  10   practices and in yet another case of theft and was subsequently

11   convicted of these offenses.

12             In 1992 he was arrested in two cases in Florida and

13   convicted in one of fraudulent use of a credit card, petty theft,

14   two counts, and grand theft; and in the other case, he was

15   convicted of uttering a forgery and petty theft.

16             In 1993 Mr. O'Hallaren was especially active in

17   Illinois.  He was arrested that year in cases that ultimately led

18   to his convictions for theft in Cook County; two cases of deceptive

19   practices in Cook County; and three cases of deceptive practices in

09:12AM  20   Lake County.  In 1994 he was arrested in Florida and subsequently

21   convicted of operating a motor vehicle without a valid driver's

22   license, driving with a license suspended or revoked, and resisting

23   an officer without violence.

24             In 1995 Mr. O'Hallaren was arrested and subsequently

25   convicted of operating an auto without an owner's consent in

1    Milwaukee, Wisconsin.   Later in 1995 the defendant was arrested in

2    Cook County in two deceptive practice cases and a theft case.

3          And in 1997 defendant was arrested and ultimately

4    convicted on two cases charging deceptive practices, and one of

5    theft and disorderly conduct in Cook County.

6          This long story -- criminal history, along with what the

7    probation officer has accurately -- but very mildly, in the Court's

8    view -- characterized as the defendant's extremely poor adjustment

9    to supervision convinces the Court that the protection of the

09:13AM 10   public from further crimes of Mr. O'Hallaren requires a sentence of

11   imprisonment.

12          At the hearing defense counsel made a point of how the

13   defendant had gone over the list of drug treatment centers,

14   selected Cornell Interventions, and on his own made the first

15   contact with Cornell.

16          Given this defendant's history and demeanor in court,

17   the Court is convinced that defendant's conduct in this regard is

18   not his facing up to his problems but rather is not wanting to

19   return to prison.   In other words, the Court is not impressed by

09:14AM 20   his conduct and sees it as just a further effort to scam the

21   system.

22          The Court is convinced that Mr. O'Hallaren is

23   recalcitrant and that nothing would be served by a sentence of

24   further supervised release even with the component to be served as

25   in-patient at Cornell Interventions, and that any sentence other

1    than one of imprisonment would result in one of too great a risk

2    that Mr. O'Hallaren would commit other crimes.

3         Accordingly, the Court is of the opinion that the

4    probation officer got it right on the recommendation and agrees

5    that the appropriate sentence is two consecutive 14-month terms of

6    imprisonment with no supervised release to follow.

7         It's ordered that the defendant Bernard O'Hallaren's

8    supervised release is revoked; he is sentenced to 14 months

9    imprisonment on Count I and 14 months imprisonment on Count Two to

09:15AM 10   be served consecutively; no supervised release to follow.

11        MR. DURKIN:  Judge, just for the record, I object to the

12   consecutive nature of the sentence.

13        THE COURT:  I'm sorry?  What?

14        MR. DURKIN:  The consecutive nature of the sentence.

15        THE COURT:  All right, so noted.

16        Anybody else?

17        MR. DURKIN:  You know, I'm just disappointed.  Maybe

18   we'll win the war on drugs between now and then.

19        THE COURT:  Pardon?

09:15AM 20        MR. DURKIN:  Maybe we'll win -- maybe the government

21   will win the war on drugs between now and then and then it will be

22   okay.

23        THE COURT:  That would be very nice.

24        MS. PRUITT:  Thank you, your Honor.

25        (proceedings concluded)

```
1                        CERTIFICATE
2          I hereby certify that the foregoing is a true and
3    correct transcript of proceedings in the above-entitled case.
4
5    _____    _____
6    Carol Raber                    Date
     Official Court Reporter
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# CLERK'S FILE COPY

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**07-1559**

*FILED*

J N MAY X 4 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

*DOCKETED*
MAY 0 7 2007

| | |
|---|---|
| UNITED STATE OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) No. 99 CR 43 |
| BERNARD J. O'HALLAREN, III, | ) Chicago, Illinois |
| Defendant. | ) February 14, 2007 |
| | ) 11:00 a.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE GEORGE W. LINDBERG

APPEARANCES:

For the Government:

U.S.C.A. – 7th Circuit
**FILED**

MAY 0 8 2007 SK

GINO J. AGNELLO
CLERK

HON. PATRICK J. FITZGERALD
UNITED STATES ATTORNEY
BY:  MR. EDWARD G. KOHLER
Assistant U.S. Attorney
219 South Dearborn Street
Suite 500
Chicago, Illinois  60604

For the Defendant:

DURKIN & ROBERTS
BY:  MR. THOMAS A. DURKIN
     MR. ANTHONY W. HILL
53 West Jackson Boulevard
Suite 615
Chicago, Illinois  60604

Court Reporter:

CHARLES R. ZANDI, CSR, RPR, FCRR
Contract Court Reporter
219 S. Dearborn Street
Suite 2144-A
Chicago, Illinois  60604
(312) 386-1225

GOVERNMENT
EXHIBIT
B

98-2

2

```
1        (Proceedings heard in open court.)
2            THE CLERK:  99 CR 43, U.S.A. versus Bernard
3  O'Hallaren.
4            Do you have everything for Mr. O'Hallaren?
5            THE COURT:  I think so.  There should be a folder
6  somewhere.  I have -- I have the -- what I need, though.
7            THE CLERK:  Okay.
8            MR. KOHLER:  Good morning, your Honor.  Ed Kohler on
9  behalf of the United States.
10           MR. DURKIN:  Good morning, Judge.  Tom Durkin and
11 Tony Hill on behalf of the defendant, who's present and in
12 custody.
13           THE DEFENDANT:  Good morning, Judge.
14           MS. PRUITT:  Good morning, your Honor.  Bobbie Pruitt
15 on behalf of the U.S. Probation Office.
16           MR. DURKIN:  Judge, we had mentioned to your clerk
17 yesterday that Mr. Brazen, who was under subpoena, was having a
18 hard time getting here and he was going to do it by phone; but
19 he was kind enough to clear his schedule today, so he's here.
20           THE COURT:  Oh.
21           MR. DURKIN:  And what I would propose is letting him
22 come and address you with Mr. -- Mr. Kohler spoke with him
23 yesterday, I think, and has a pretty good understanding of what
24 he is proposing, and I think Bobbie Pruitt spoke to him this
25 morning.  So, if you don't mind doing it informally -- it would
```

1  be my suggestion we do it informally and have him come to the

2  podium and discuss it with you.

3          THE COURT:  All right.  That's fine.  No need to put

4  him under oath as far as --

5          MR. DURKIN:  It's okay with me.

6          MR. KOHLER:  It doesn't -- he doesn't need to be

7  under oath for this, Judge.

8          THE COURT:  Okay.

9          MR. DURKIN:  Judge, this is Christopher Brazen, who

10 is the -- he can tell you his title and so forth and summarize

11 the treatment program that he's proposing for Mr. O'Hallaren.

12         THE COURT:  Okay.

13         MR. BRAZEN:  Good morning, your Honor.  How are you?

14         THE COURT:  Okay.

15         MR. BRAZEN:  Okay.  My name is Christopher Brazen.

16 My title is intake assessment supervisor with Cornell

17 Intercept.

18         THE COURT:  And where is that located?

19         MR. BRAZEN:  The street address is 5701 South Wood

20 Street, Chicago, Ill, 60636.

21         THE COURT:  Okay.  Go right ahead.

22         MR. BRAZEN:  The program that Bernard is eligible for

23 is a -- called a men's residential program.  It's a variable

24 length of care program.  It usually runs 30, 60, 90 days in

25 length.  Most patients we have that are involved with the court

4

1  system tend to be there for 90 days.

2          After care is usually recommended in the form of an
3  intensive outpatient, which runs four to six weeks in length.
4  That's Monday through Thursday mornings from 9 to 12:30.
5  That's Level 2, your Honor, Level 2 treatment care.  That's
6  followed by Level 1, which is more of a traditional based
7  outpatient program, which is on Monday, Wednesday, and Thursday
8  evenings from 6:00 until about 8:00, 8:30.  That usually runs
9  one to three months in length.

10          There are urinalyses available during the period, but
11  that's within our budgetary constraints.  The program is a
12  volunteer treatment program, falls back on the 12-step model,
13  with groups on relapse prevention, cognitive behavioral
14  therapy, involves large groups, small groups, individual
15  counseling sessions with the counselor.  It is overseen by a
16  doctor, as well as having its own unit nurse in case any
17  medical needs arise.

18          THE COURT:  What kind of doctor is that?

19          MR. BRAZEN:  A physician with a specialty in
20  addictionology.

21          MR. DURKIN:  If -- if at the end -- would you
22  anticipate that Mr. O'Hallaren would be -- you'd recommend
23  90 days for him, under the circumstances?

24          MR. BRAZEN:  Under these circumstances, yes, sir.

25          MR. DURKIN:  If the Court saw fit to permit him to do

5

1 that and then ordered, subsequent to the 90 days, that he be
2 confined to the Salvation Army halfway house in a community
3 confinement program, which I believe the maximum term would be
4 120 days, assuming Mr. O'Hallaren could be released from the
5 halfway house to go to your treatment program, would that be
6 consistent with the goals of your treatment program?

7         MR. BRAZEN:  Yes, it would.  We highly recommend, you
8 know, some level of after care, including possible placement at
9 the Salvation Army, plus our outpatient program.  Unless they
10 have a strong after care program once they're released, it
11 reduces their chances of relapsing greatly.

12        THE COURT:  How many -- how long has the organization
13 been active?

14        MR. BRAZEN:  Interventions itself was founded
15 approximately 1977.

16        THE COURT:  And it's operated continuously at that
17 location since then?

18        MR. BRAZEN:  Cornell purchased it -- I was with them
19 when they were called Interventions itself.  Cornell was a
20 private company that purchased us -- gosh, your Honor, I want
21 to tell you 1992.  I've been with the company 23 of the past
22 25 years.

23        THE COURT:  And do you keep any kind of recidivism
24 statistics or success or whatever you might want to call it?
25        MR. BRAZEN:  There are, but I don't have them

6

1 available.

2           THE COURT:  Okay.

3           MR. BRAZEN:  In terms of a rough,

4 off-the-top-of-the-head knowledge --

5           THE COURT:  Yeah.

6           MR. BRAZEN:  -- of being drug-free, it probably falls

7 in that 10, 15 percent bracket, which is generally equal to any

8 other treatment program.

9           THE COURT:  In other words, it's 15 percent

10 successful or 85 percent successful?

11           MR. BRAZEN:  15 percent successful of being

12 drug-free.

13           THE COURT:  Okay.  And are -- are patients -- do you

14 call them patients or --

15           MR. BRAZEN:  Patients, yes, sir.

16           THE COURT:  Are they recycled if they fail?

17           MR. BRAZEN:  They're allowed readmission, yes.

18           THE COURT:  Let me ask perhaps Mr. Durkin, how is

19 this funded, his treatment?

20           MR. BRAZEN:  We're funded through the state, private

21 insurance companies.

22           MR. DURKIN:  It's my understanding, Judge -- and he

23 can correct me if I'm wrong -- that he's analyzed

24 Mr. O'Hallaren's financial circumstances, and he would qualify

25 for a state-funded bed, as they would call it.

7

1        MR. BRAZEN:  That's correct, sir.

2        MR. DURKIN:  So that there would be no cost to either
3  probation or the Court for that treatment.

4        THE COURT:  Okay.  Anything further, Mr. Durkin, that
5  you want to bring out?

6        MR. DURKIN:  Based on your conversations with
7  Mr. O'Hallaren -- well, let me just follow up with one of the
8  judge's questions.  There's a 15 percent success rate, as
9  you've just said, roughly?

10       MR. BRAZEN:  Yes, sir.

11       MR. DURKIN:  Is that consistent with national
12 averages?

13       MR. BRAZEN:  Yes, sir.

14       MR. DURKIN:  And does that -- by that, you simply
15 mean, however, the percentage of people who remain completely
16 drug-free from the moment they leave, correct?

17       MR. BRAZEN:  Yes, sir.

18       MR. DURKIN:  Do you know what the statistics are with
19 respect to ultimate recovery, for want of a better term?

20       MR. BRAZEN:  Lifelong?

21       MR. DURKIN:  Yes, sir.

22       MR. BRAZEN:  No, I don't.

23       MR. DURKIN:  But it would be better than 15 percent,
24 would it not?

25       MR. BRAZEN:  Yes, sir.

8

1         MR. DURKIN:  Based on your -- how many times have you

2 spoken with Mr. O'Hallaren?

3         MR. BRAZEN:  Directly?

4         MR. DURKIN:  Yes.

5         MR. BRAZEN:  I would say two to three.

6 Mr. O'Hallaren has sent me correspondence with a lot of -- from

7 my perception with his correspondence, there's a lot of

8 treatment readiness.  He seems to have come to terms that,

9 "This is my life.  I have to take control.  I have to leave the

10 past in the past, and I have to move forward to get a better

11 life."

12         THE COURT:  When was the first time he made contact

13 with you?

14         MR. BRAZEN:  May I look?

15         THE COURT:  Sure, of course.

16    (Conference between counsel, not within hearing.).

17         MR. DURKIN:  Judge, he has a brochure from the place

18 that I'll tender to the Court.

19         THE COURT:  Okay.  Thank you.  Do you remember --

20         MR. BRAZEN:  Yes, sir.  My first conversation was on

21 January 5th of this year.

22         THE COURT:  Okay.  Mr. Kohler?

23         MR. KOHLER:  I don't have any questions for the

24 witness, your Honor.

25         THE COURT:  Okay.

9

MR. KOHLER:  I did speak with him yesterday, and what he's explained to the Court is consistent with what he explained to me yesterday.

MR. DURKIN:  Judge, could I ask one other question that I think is important?

THE COURT:  Of course.

MR. DURKIN:  Is it correct that Mr. O'Hallaren voluntarily contacted your agency?  This was not a referral that was made by his lawyers or anyone else, is that correct?

MR. BRAZEN:  That is correct.

MR. DURKIN:  And he was able to obtain your center's name from a list of names that he had been given -- that he had asked for at the MCC, correct?

MR. BRAZEN:  Yes, sir.

MR. DURKIN:  And are you familiar with what steps he's taken since he's been at the MCC with respect to the treatment, such as going to Alcoholics Anonymous?

MR. BRAZEN:  Not directly.  I've had occasional conversations with Mr. Owens, who was his counselor at the MCC.

THE COURT:  Okay.

MR. DURKIN:  Judge, in that regard, we do have a letter dated -- it's actually a memo that at least reflects the fact -- and I -- I don't need to -- I'll show it to you.  I don't know that we need to make it part of the record, but it does show that Mr. O'Hallaren is one of many people who have

1  participated in Alcoholics Anonymous.  I'd rather not make that
2  part of the file because --
3            THE COURT:  No, that's fine.
4            MR. DURKIN:  -- because of the sensitivity.
5            There is one other particular -- there's a report
6  from the Bureau of Prisons psychology data system that talks
7  about a self-study program regarding quitting cocaine that
8  Mr. O'Hallaren participated in, and I think that would be -- I
9  have no problem with that staying in the file.
10            THE COURT:  Okay.  Do you want me to keep this, or do
11  you want to keep it?
12            MR. DURKIN:  I can keep it.  If anybody needs it,
13  we'll have it.
14            MR. KOHLER:  Judge, if I could ask one question based
15  on what Miss Pruitt -- and this is a good question.  If the
16  Court were so inclined to order this, the defendant would still
17  be on supervised release; and the probation department would
18  like to know what contact, if any, can they have with either
19  Mr. O'Hallaren and/or the treatment facility during the period
20  of time that he's there?
21            THE COURT:  Okay.  Good question.
22            MR. BRAZEN:  Once the releases are signed for us to
23  have contact either with the courts or Mr. O'Hallaren's
24  probation officer, they're more than willing to call --
25            THE COURT:  No limitations of any kind?

11

           MR. BRAZEN:  No, sir.  There's also -- you know,
there can be arrangements if the probation officer wants to
come visit.  That's been done.  That can be done.  And if you
choose to, it will be done.

           THE COURT:  Miss Pruitt, is there anything else you'd
like to suggest or ask or anything?

           MS. PRUITT:  No, your Honor.  I had the privilege of
speaking with him before the hearing, and I think it's --

           THE COURT:  Okay.  Let me just take a few minutes to
absorb this, and I'll be back with you.

           MR. KOHLER:  Judge, can I make a couple of
suggestions as to --

           THE COURT:  Sure.

           MR. KOHLER:  Not concerning this particular witness,
but if the Court is contemplating this particular program,
there are a couple of things that we've discussed that the
Court might also want to consider with it.

           The suggestion here is that he does this program for
90 days and that he then be ordered to -- as another part of
the supervised release to go to the Salvation Army for 120
days.

           THE COURT:  Um-hum.

           MR. KOHLER:  Probation obviously would be the ones
who would say what he could do during that period of time.  If
he had made substantial improvement, we'd say, "Well, go to

12

1 work."  Maybe it could be work release, but it would be 120

2 days in the Salvation Army.

3       It's also, Judge, from the government's standpoint,

4 imperative that during this period of time, the defendant

5 address any of these other outstanding issues that he has, the

6 special report that the Court recently received about that AAA

7 ticket broker thing, the bad checks, apparently, that he's been

8 involved in.  All of that has to be put behind him.

9       Also, Judge, Mr. O'Hallaren has written a letter to

10 the Marshals Service asking for certain items back that were

11 seized at the time of his arrest when he walked away from the

12 Salvation Army while he was in BOP custody.  He didn't ask for

13 some of the things, Judge, that we would never give back to

14 him, but the three things that he asked for was about $1200 in

15 cash, a Rolex watch, and a cell phone.

16       I don't think the Marshals Service has any problem

17 giving back the watch or the cell phone, but the government

18 would request that the $1200 be put towards the $149,000 in

19 restitution that the defendant still owes.

20       MR. DURKIN:  Judge, could I just -- I don't -- I

21 don't have a -- I have a conceptual problem with the $1200,

22 because I don't think there's any lawful basis to do that, but

23 I don't have a problem -- Mr. O'Hallaren doesn't have a

24 problem -- even though it may be beating me out of my money,

25 Mr. O'Hallaren doesn't have a problem, if he can ultimately get

13

1 out to work.  He would have a big problem with that if he ended
2 up getting the 24 months, because he would then have no means
3 to pay his lawyers, but I'm willing to waive -- I'm willing to
4 wait on my money.
5        But I would -- it's my understanding -- and I was not
6 his lawyer at the time of the sentencing, but it's my
7 understanding that what I'd like to see is I'd like to see that
8 if the $1200 is going to be given to the government, I'd like
9 to see it go to the other outstanding issues that -- these bad
10 checks and the ticket broker issues rather than the
11 restitution, because it was my understanding, according to
12 Mr. O'Hallaren -- and this may be not -- I wasn't his lawyer,
13 but it's my understanding that the government was given 100 --
14 was given five months or something to come up with a list of
15 victims who the restitution would be payable to, and they
16 weren't able to do that, if that's -- I don't know whether
17 that's accurate or not.
18        MR. KOHLER:  Actually, I think it was additional
19 victims, Judge.  The order was for $149,000.  There was some --
20 I believe, and we can look at this, counsel, that there were
21 some specified victims.  There were others.  Because there were
22 so many victims, some were hard to identify.  But we can --
23 obviously, Judge, we can look at this.  It is what it is.
24        MR. DURKIN:  My only point is that it -- the $1200
25 would go a lot longer -- would go a lot farther,

14

1  percentage-wise, towards these other issues rather than the
2  restitution issue, but --
3          THE COURT:  Okay.  I'll be back with you in a few
4  minutes.
5          MR. DURKIN:  That's fine.
6          MR. KOHLER:  Judge, the other request that I make --
7  I'm sorry, Judge.
8          THE COURT:  No, that's okay.  I thought we were done.
9          MR. KOHLER:  If the Court is contemplating doing
10 this, what the government would request is that the pending
11 probation report seeking the revocation of the defendant's
12 supervised release be held in abeyance during this period of
13 time, that those particular charges not be addressed, that the
14 defendant be given this opportunity to work through this.  If
15 he doesn't and doesn't comply with the Court's order at this
16 point in time, then those other charges, in addition to any new
17 charges, would be entertained.
18         MR. DURKIN:  And that's acceptable, Judge.
19         THE COURT:  Okay.
20     (Bench conference.)
21         THE COURT:  Is the government taking a position on
22 this Cornell aspect of this?
23         MR. KOHLER:  Let me try to explain, I guess, what the
24 government's position is, Judge.  I think our position is
25 consistent with the probation department, that what

1 Mr. O'Hallaren has done up to date merits a severe punishment.

2        All that said, from the government's view, and based

3 on what Mr. Brazen has said and his belief that there is

4 something that can be done for the defendant, it would be the

5 government's recommendation that the Court go with this

6 package, if you will, Judge, with the treatment and the

7 Salvation Army, but only on the grounds that the defendant

8 understands that this is his last chance, that if he doesn't

9 fully comply, if he walks away from the treatment, if he walks

10 away from the Salvation Army, if he writes any more bad checks

11 or defrauds anyone else, the government's position won't be as

12 lenient, and we will seek the fullest and most drastic penalty

13 that we can.

14        But, yes, the government would recommend that the

15 defendant be given one more chance.

16        THE COURT:  Miss Pruitt, you voiced your view last --

17 at the last hearing.  Do you have any new views, or are you

18 staying with your original view?

19        MS. PRUITT:  I'm going to stay with my original

20 recommendation, your Honor.

21        THE COURT:  Okay.  And let me ask.  There are two

22 violations, three, four -- five violations in this report.

23 Mr. Durkin, does the defendant acknowledge the violations,

24 committing the violations?

25        MR. DURKIN:  He does, Judge.  Could I just see --

16

1  there's a factual issue with --

2          THE COURT:  Condition No. 1, the failure to report to

3  the probation officer and submit a truthful written report?

4          MR. DURKIN:  No, that -- we acknowledge that.

5          THE COURT:  Then you've got No. 2, failed to

6  participate in drug after care.

7          MR. DURKIN:  We acknowledge that.  We acknowledge

8  No. 3, that he used a controlled substance, No. 4 -- we

9  acknowledge all of them, Judge.

10          THE COURT:  All right.  Including No. 5?

11          MR. DURKIN:  No. 5, yes.

12          THE COURT:  Okay.  Let me take a few minutes.

13          MR. KOHLER:  Thank you, Judge.

14      (Recess had.)

15          THE COURT:  Okay.

16          THE CLERK:  99 CR 43, U.S.A. versus Bernard

17  O'Hallaren.

18          MR. KOHLER:  Ed Kohler once again, your Honor, on

19  behalf of the United States.

20          MR. DURKIN:  Tom Durkin and Tony Hill for the

21  defendant.

22          MS. PRUITT:  Bobbie Pruitt on behalf of U.S.

23  Probation.

24          THE COURT:  Okay.  The Court will take a few days to

25  make a decision.  I want to look at this material and give some

1 thought to what's the best avenue to proceed here.  So, I'm

2 going to have you back -- what time on Tuesday?

3           THE CLERK:  11:00 o'clock.

4           THE COURT:  11:00 o'clock on Tuesday.

5           MR. DURKIN:  Let me just check that, Judge.

6           THE COURT:  Okay.  That's the 20th.

7           MR. KOHLER:  Judge, I'm in court that morning.  Could

8 we do it in the afternoon by any chance?

9           THE COURT:  Let's see.

10           MR. DURKIN:  Judge, I have a sentencing in the

11 Central District of Illinois that day at 11:00.

12           THE CLERK:  Can you all do it early in the morning?

13           THE COURT:  No, not if he's going to central

14 Illinois.

15           MR. DURKIN:  I've got to be in Springfield.

16           MR. HILL:  What day?

17           THE CLERK:  That's a Tuesday.

18           THE COURT:  Well, it looks like we're going to have

19 to take more time, then, because I'm going away the next day.

20           MR. DURKIN:  Judge, if it's just a question of you're

21 going to rule, I could have Mr. Hill come in on Tuesday.

22           THE COURT:  Okay.  But you've got a problem.  Can you

23 come in in the afternoon?

24           MR. KOHLER:  I can be in any time in the afternoon,

25 Judge.

                                                                    18

1          THE COURT:  What's the earliest time you can be here?
2          MR. KOHLER:  12:30, Judge.
3          THE COURT:  Sandra?
4          THE CLERK:  That's fine, Judge.
5          THE COURT:  I'll tell you what.  Let's make it at
6  1:00 o'clock.
7          THE CLERK:  I'm sorry, Mr. -- can you be here early?
8          THE COURT:  Mr. Kohler?
9          MR. KOHLER:  What time is early?
10         THE COURT:  Like 9:00, 9:30.
11         MR. KOHLER:  I can be here at 9:00 o'clock.
12         THE COURT:  We can do it at 9:00 o'clock.
13         MR. HILL:  That works for me, Judge.
14         THE COURT:  Sandra, just be sure that Mr. O'Hallaren
15  gets here.  Okay.  That's the best.  We'll see you then on the
16  20th at --
17         THE CLERK:  9:00 a.m.
18         THE COURT:  -- 9:00 a.m.
19         MR. KOHLER:  Thank you very much, Judge.  Appreciate
20  it.
21         MS. PRUITT:  Thank you, your Honor.
22      (Which were all the proceedings heard.)
23
24
25

19

CERTIFICATE

1
2
3        I hereby certify that the foregoing is a true and
4 correct transcript of the proceedings in the above-entitled
5 case.
6
7 _____          _____, 2007.
8 CHARLES R. ZANDI               May 4
  Contract Court Reporter
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# United States Court of Appeals

For the Seventh Circuit

Chicago, Illinois 60604

## JUDGMENT - WITH ORAL ARGUMENT

---

Date: October 2, 2007

BEFORE:          Honorable WILLIAM J. BAUER, Circuit Judge

                 Honorable TERENCE T. EVANS, Circuit Judge

                 Honorable ANN CLAIRE WILLIAMS, Circuit Judge

No. 07-1559

UNITED STATES OF AMERICA,
          Plaintiff - Appellee
     v.

BERNARD J. O'HALLAREN, III,
          Defendant - Appellant


Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
No. 99 CR 43, George W. Lindberg, Judge


     The judgment of the District Court is VACATED and this case is
REMANDED to the district court for resentencing.  Circuit Rule 36 shall
apply on remand.  The above is in accordance with the decision of this
court entered on this date.


(1061-110393)



GOVERNMENT
EXHIBIT
C

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3  UNITED STATES OF AMERICA,        )  Docket No. 99 CR 43
                                    )
4                     Plaintiff,    )
                                    )
5          v.                       )  Chicago, Illinois
                                    )  January 11, 2008
6  BERNARD J. O'HALLAREN, III,      )  12:00 o'clock p.m.
                                    )
7                     Defendant.    )

8       TRANSCRIPT OF PROCEEDINGS - SHOW CAUSE HEARING
          BEFORE THE HONORABLE WILLIAM J. HIBBLER
9
   APPEARANCES:
10
   For the Government:           HON. PATRICK J. FITZGERALD
11                               United States Attorney, by
                                 MR. EDWARD G. KOHLER
12                               Assistant United States Attorney
                                 219 South Dearborn Street
13                               Chicago, Illinois 60604

14 For the Defendant:           DURKIN & ROBERTS, by
                                 MR. THOMAS ANTHONY DURKIN
15                               MR. ANTHONY WILLIAM HILL
                                 53 West Jackson Boulevard
16                               Suite 615 60604
                                 Chicago, Illinois 60604
17

18 Also Present:                MS. BOBBIE PRUITT
                                 U.S. Probation Officer
19

20

21

22              ALEXANDRA ROTH, CSR, RPR
                   Official Court Reporter
23              219 South Dearborn Street
                        Room 1224
24              Chicago, Illinois 60604
                     (312) 294-0134



GOVERNMENT
EXHIBIT
D

25

1      (Proceedings had in open court:)

2           THE CLERK:  99 CR 43, USA versus O'Hallaren.  Rule to

3   show cause hearing.

4           MR. KOHLER:  Good afternoon, your Honor.  Ed Kohler on

5   behalf of the United States.

6           THE COURT:  Good afternoon.

7           MR. DURKIN:  Good morning, Judge.  Tom Durkin and Tony

8   Hill on behalf of the defendant, who is present.

9           MS. PRUITT:  Good morning, your Honor.  Bobbie Pruitt

10  on behalf of U.S. Probation.

11          THE COURT:  Thank you.

12          MR. DURKIN:  Judge, I think we're prepared to proceed.

13  I wanted to just give you documents, most of which I think

14  you've already either seen or heard of.  But I wanted to make

15  sure they were part of the record.

16          THE COURT:  Okay.

17          MR. DURKIN:  I have marked them A through F.  And I'll

18  identify them for the record.  But I'm pretty confident that

19  you have -- there is nothing new here.

20          Exhibit A is a report dated January 2, 2008, from the

21  Bureau of Prisons.  It's a -- it's captioned, Federal Bureau of

22  Prisons psychology data system.  And it indicates that he

23  had -- Mr. O'Hallaren had volunteered and completed a self-

24  study journal called My Personal Journal.  And it explains its

25  relationship to chemical dependency, first steps, spirituality,

1  relapse prevention, life management, a number of, I guess for

2  want of a better term, addictionality type issues.  Or 12-step

3  program work if you will.

4         Exhibit B is a proof of attendance at Alcoholics

5  Anonymous, which the defendant will address with you.

6  Exhibit C is another Federal Bureau of Prisons psychology data

7  system report.  I believe this is in the record already but I'm

8  not sure it's been marked.  It's dated 11/14/2007.  It's

9  regarding 60-day residential review.  Again it's just more of

10  the steps he's taken while he's been incarcerated.

11         D is another U.S. Department of Justice, Bureau of

12  Prisons progress report, much of the same.  E is a memo dated

13  November 12, 2007, which attaches a certificate that he

14  obtained in the institution with respect to this living-free

15  values program that he was in.

16         And F is an inmate education data transcript regarding

17  classes he's taken.  Again it's self- explanatory, much of

18  which has to do with both treatment issues, courses regarding

19  treatment, and some other things that would help him on the

20  outside.  The date of that is November 2, 2007.

21         THE COURT:  Those items will be received and made part

22  of the record.

23      (Said exhibits were received in evidence.)

24         MR. DURKIN:  Thank you.

25         Again, these are being offered with respect to what

1    the appropriate sentence should be, acknowledging what the
2    guideline range is, which we don't dispute.  Mr. O'Halleren has
3    given me a very -- a three-and-a-half page statement that I
4    think he'd like to either read or address you with in a minute,
5    if we could.
6             THE COURT:  Okay.
7             MR. DURKIN:  It's actually rather eloquence, frankly.
8             Also here today -- and this will be an issue that I
9    believe Mr. O'Halleren wants to address.  His father is here.
10   His father is Bernard O'Halleren, I guess, the Second, or
11   Junior.  He is here.
12            One of the issues Mr. O'Halleren, the defendant, wants
13   you to take into account in a suggestion we have that the 14
14   months should be sufficient, or at least some sentence that
15   would have him released now so that one of the issues is so
16   that he could tend to help his father with his health
17   condition.  His father has had a whole series of medical
18   setbacks over the last year and a half, the largest portion of
19   which is a heart condition that he can address if you have any
20   questions of.  But I think even the government is aware of some
21   of this.  I know some of it came up in the course of our
22   discussions the last time.
23            MR. KOHLER:  I think over the years, Judge, I have
24   understood that Mr. O'Halleren, Jr., has had some health
25   problems.  I don't know there is a dispute.  To the extent of

1    those, I can't speak.  But --

2              MR. DURKIN:  He is here.  I don't think there is

3    really any dispute.  He is frankly someone I have known for a

4    long time.  He is a friend of my father's, which is why I am

5    here.  And I have watched his health deteriorate over the time

6    I have been representing Mr. O'Hallaren, the defendant.  And he

7    has gone from someone that we used to play golf with, rather

8    robust and healthy senior citizen, to someone who it pretty

9    much took everything he had to get downtown today.  So that's

10   another issue that we would like to proffer as a means that Mr.

11   O'Hallaren needs his son.

12             I guess the only thing I would want to say is that it

13   seemed to me that we were in a very unusual situation the last

14   time we argued this sentencing -- actually never argued the

15   sentencing.  When we were in front of Judge Lindberg, we had

16   the unusual situation of the probation department asking

17   essentially for double the guidelines and the government, on

18   the other hand, agreeing to one last chance for treatment,

19   which I thought was kind of polar opposites.

20             And I honestly thought the only reason Judge Lindberg

21   left the bench was to give more thought to the treatment

22   program.  I never dreamed we were really talking about 28

23   months because I just didn't -- it's not how the case was set

24   up at the time.

25             So we never really had to address the appropriateness

1  of the sentence.  Had I had that opportunity, I would have said

2  the same thing then that I am saying to you now.  Only now

3  it's -- it has some added force because he's been incarcerated

4  all this time.

5          The fact of the matter is, and what I had said earlier

6  was that Mr. O'Hallaren is an addict.  And we all have seen

7  these cases on supervised release that just continue to seem to

8  get compounded because of the initial underlying problem which

9  we really can't do -- the only person that can do anything

10  about it is him.  And I have always had a lot of trouble

11  conceptually with the concept that we can actually be the drug

12  police.  I know it's a noble idea to try to keep somebody on

13  supervised release, to make sure that they are not out

14  committing crimes and that they get some help.

15          The flip side of it is, however, that I think there

16  comes a point when you have to acknowledge that either he has

17  to sink or swim on his own and that there is really not much we

18  can do about it.

19          I think he's reached that point now.  I've noticed a

20  significant difference in his attitude since he's been

21  incarcerated this last time.  I would be lying to say, however,

22  that I didn't see much of that same attitude, however, at other

23  times when he was incarcerated.

24          I think he realizes more than anyone that he is his

25  own worst enemy, and that all of the underlying crimes here are

1   the result of this issue of whether he's ever going to be able
2   to get it in his own head that he has to help himself.

3          So in that regard, I'm suggesting to you that I think
4   he's probably pretty much gotten as much as he's going to be
5   able to get out of any treatment plans.  I'm not a stranger to
6   this topic myself.  And I certainly know that the bottom line
7   is that either he's going to get into AA or NA or a combination
8   of both, and he is going to learn to live one day at a time and
9   learn to accept the fact that he cannot use drugs or alcohol
10  under any circumstances.

11         If he doesn't get that now, there is nothing we can do
12  about it, to be blunt.  And that's not to say that I would -- I
13  am advocating just let everybody go and let them -- let
14  everyone go wild.  But I think if you look at the underlying
15  basis of his problems and you look at the crimes that he
16  actually stands before you on, I mean, the probation
17  violations, the supervised release violations are rather -- I
18  mean, if you look at all the violations, they are all pretty
19  minimal violations:  Failing to report and to submit a truthful
20  report.  That he shows up late.  He failed to participate in
21  the drug aftercare, which again is typical addict behavior.

22         Violation No. 3, unlawfully used a controlled
23  substance.  Failed -- No. 4, failed to submit the mandatory
24  drug testing and, you know, failed to follow instructions.

25         You know, these are really not crimes.  They are

1    problematic.  I'm not saying we should ignore them either.  But

2    I have a hard time extrapolating from that the suggestion that

3    somehow he should get 28 months when the revocation guideline

4    range is only eight to 14 months.

5            I usually find myself arguing in the reverse on the

6    guidelines, which is I'm usually asking people to go below the

7    guidelines rather than above them.  I -- with all due respect

8    to the probation officer, who I do have a great deal of respect

9    for, I just don't think that's correct in this situation.

10           I think the 14 months should do it.  I think he's been

11   in custody now on this violation 13 months and two weeks.  I

12   think that's -- if you add those 13 months and two weeks to the

13   time he's been incarcerated, he's been incarcerated 108 months

14   on a 96-month sentence initially.  And I -- I just think there

15   is better use of bed space in the institutions.  I think there

16   is a better solution here, and I think a 14-month sentence

17   would be appropriate.  So that's my position.

18           Would you like to hear from the government or Mr.

19   O'Hallaren next?

20           THE COURT:  Well, why don't we finish the defendant.

21           MR. KOHLER:  Judge, maybe before Mr. O'Hallaren

22   speaks -- and if it's not appropriate now, we can wait until

23   later -- you did ask us to provide you with information from

24   the Bureau of Prisons.  This might be a good time for us to

25   make that report to you in case Mr. O'Hallaren wants to say

1    The reality of the situation here is that he's served
2    more time than he was even ordered to serve on the original
3    sentence. And to send him back to the institution simply to
4    get more treatment, that would be another, how many months? We
5    would be talking about then 115.
6    (Brief pause.)
7    MR. DURKIN: So he would have served -- by then he
8    would be serving 115 months on a total 96-month sentence. I
9    don't -- I just don't understand that.
10    So could I just speak to him for a second?
11    THE COURT: Sure.
12    (Brief pause.)
13    MR. DURKIN: Judge, he is -- I have covered most of
14    the issues that he had in this letter. So I'm not going to
15    have him read that. He just wants to talk to you.
16    THE COURT: Sure.
17    THE DEFENDANT: Good afternoon, Judge. Thank you for
18    the opportunity to address the Court.
19    First off, I would like to sincerely apologize to
20    yourself. And I'd like to apologize to Ms. Pruitt because I
21    never gave Ms. Pruitt an opportunity to help me at all. I went
22    through a traumatic experience with just being released from
23    prison. And it set off a series of events that I'm
24    embarrassed. I'm ashamed. And none of this should have ever
25    happened. Where -- I feel -- I personally feel like I wasted

1   every person's time in this courtroom today.  Mr. Durkin's

2   time, Mr. Hill's time, trying to sort through all this --

3           MR. DURKIN:  I will second that, Judge.

4           THE DEFENDANT:  -- because I could not affectively

5   deal with life on life's terms.  And it's ironic that I use

6   that word, that phrase, because that's a phrase I picked up in

7   the program.

8           Judge, I understand that this is -- I'm 46 years old.

9   I lost my mother in 2004, when I was in prison on the original

10  sentence.  And she died alone in a hospital in Florida.  And I

11  blame myself because I wasn't there to help her.  She was there

12  by herself in a hospital with no family, no friends, nobody.

13          My father just recently in August had another heart

14  open surgery.  And I could have lost him, and I wouldn't have

15  been there for that either because I couldn't live life on

16  life's terms.

17          I apologize.  And I understand that apologies, you

18  know, at this point -- I don't know who believes in what I say

19  anymore.  And sometimes I question myself of what goes through

20  my mind at times where I could pick up a phone.  I could have

21  called Ms. Pruitt.  I could have called Mr. Durkin.  I could

22  have said, hey, I have a problem.  I eventually did, but by

23  then it was way too late and I couldn't.  I was a mess.

24          But, Judge, I believe that treatment in some form or

25  fashion is going to be prevalent in my life from now until the

1    day I die, because I'm fighting a disease that, to be frank, I

2    have a hard time dealing with it.  But if I continue doing what

3    I've been doing, I've been -- 14 months I haven't had a

4    problem.  I've been controlled obviously.  But, I mean, facts

5    being facts, substances are available in prisons just like they

6    are in the street, and I haven't partaken in any of that.

7         I take this time you're giving me very seriously.  I

8    take this very seriously.  And I take my life very seriously

9    because there is a man sitting back there who I love more than

10   anything in the world.  And I let him down.  I let him down a

11   lot.  And he doesn't deserve any of this.  He doesn't deserve

12   to be here right now.

13        Judge, I'm asking you, I'm begging you, to some type

14   of supervision so I could continue to work forward.  And I'm

15   doing this against counsel's recommendation.  I want to go and

16   get back.  And I've talked to Mr. Hill.  I wrote him a letter

17   the other day.  I would like to try to contact the man from

18   Cornell and do n out-patient program who came to court in

19   February and spoke of their program.  And I tried to reach out

20   to him, but time was short, and I didn't know when we were

21   coming.

22        And I'm just asking, Judge, that the 14 months I have

23   served be the sentence with some additional -- I will go to the

24   halfway house.  I'll do anything.  I'm not in a position to

25   bargain.  I'm not in a position to ask.  I'm just saying, I'll

1   do whatever you say.

2          I'll do whatever Ms. Pruitt says.  I know she doesn't

3   believe me, and she doesn't have any right to believe me -- she

4   has no reason to believe me because I never gave her anything

5   close to a fair shake.  And I apologize to her for that again.

6          I thank Mr. Kohler.

7          I'm open for questions if you have anything.

8          THE COURT:  I do have one or two questions.

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  During the period that you have been back

11   at the MCC, you have received no treatment, no treatment, is

12   that correct?

13          THE DEFENDANT:  No, sir.  I volunteered for a program.

14   It's Exhibit A, sir.  I volunteered for a program with Dr.

15   Greenstein who is the drug treatment coordinator at the MCC.

16   When I realized in November that we were going to have a delay,

17   I immediately went to him, and for the eight weeks that we've

18   been here up until the 2nd when I finally completed it.

19          THE COURT:  Because as I listen to your counsel and

20   his suggestion that he wishes to have you sentenced to the 14

21   months which you have already done, I am concerned that you are

22   not in a position, I don't think, to go out now and be required

23   on your own to find the proper treatment facility and to get

24   the help that you probably still need.  I would be concerned

25   about perhaps putting you at Salvation Army or some other

1  facility for about a three-month period so you could transition

2  from that program into an out-patient program that you can

3  choose and that would be available to help you beyond that

4  short period that you are between your ultimate release and

5  your getting out of custody.

6        THE DEFENDANT:  I completely agree with you, sir.  I

7  was very successful at the Salvation Army.  The second time I

8  was there I spent five and a half months there with not an

9  incident.  I was -- I am agreeable, totally agreeable to that.

10 And there are some people there that I know, that I've had

11 dealings with in DTS.  They're drug treatment specialists that

12 I've known.  Dr. Reynolds is one.  And Sheri Larson is another

13 that I've worked with in the past.  And I would look forward

14 to -- I would welcome the opportunity to work with them again.

15       THE COURT:  Thank you.

16       Government?

17       MR. KOHLER:  Consistent with what I said the other

18 day, Judge, we are not -- we are not going to recommend a

19 specific sentence.  The Court is well aware that when we

20 originally appeared in front of Judge Lindberg in this case,

21 although at the time we -- not like violations but the whole

22 history of the defendant was extremely serious.  We were

23 looking to give him that one last chance, that chance to

24 recover from this drug problem, that -- frankly, Judge, I've

25 been the prosecutor on this now for over ten years.  And it's

1  recommendation and justification in paragraph 3 on page 5 of

2  the report, pursuant to Title 18 U.S. Code Section 3583(h), we

3  impose a term of supervised release.  A class C felony offense,

4  a term of supervised release shall not exceed 36 months.

5          I mean, maybe I'm missing something.  But, I mean,

6  then it says, supervised release -- for class C felony offense,

7  the term of supervised release shall not exceed 36 months less

8  the cumulative prison terms imposed in each count upon this and

9  prior revocations.  By statute all terms of supervised release

10 must run concurrently.

11         So I am --

12         MR. KOHLER:  In any event, counsel, do we all agree

13 that there is a -- at last a 36-month cap here, and it was --

14 the prior sentence was 28 months.  So it was under that cap?

15         MR. DURKIN:  No, I don't agree with that.

16         MR. KOHLER:  That's what you just read, though, the 36

17 months.

18         MR. DURKIN:  That's supervised release, less the

19 cumulative imprisonment terms imposed on each count by -- upon

20 this and prior revocations.

21     (Brief pause.)

22         THE COURT:  Well, let me say this.  I am not in any

23 way suggesting that the sentence imposed by Judge Lindberg was

24 in any way incorrect.  I think based upon the facts related to

25 the Court and the efforts made by the defendant to change his

1  life and his dependency upon narcotics, that I think that that

2  sentence is no longer necessary for the purposes that

3  sentencing is designed.

4         MR. DURKIN:  That's fine.

5         THE COURT:  I will resentence the defendant to a

6  period of 14 months consecutive on both counts -- concurrent on

7  both counts and order that the defendant be released forthwith

8  to the Salvation Army for a three-month period to transition

9  back into freedom.  I think that that's necessary in order to

10  give the defendant some bridge between custody and outright

11  release, to try and help him prepare for that release so that

12  he doesn't find himself standing before another Judge in the

13  near future.

14         MR. DURKIN:  That's fine.

15         THE COURT:  I also agree with the fact that on the

16  original sentence there was no period of supervised release

17  attached.  And I won't attach a period of supervised release.

18  So that when you get out of the Salvation Army, you will be

19  free.  But whether or not you remain free is a decision that

20  you have to make.

21         And I hope for your sake and for ours, we don't see

22  you standing before another Judge someplace.

23         THE DEFENDANT:  Thank you very much, your Honor.  And

24  I promise I'll do my best.

25         MR. DURKIN:  Thank you, Judge.

1    THE COURT:  Now, this is a final and appealable order.

2    If you wish to file a notice of appeal, you must do so within

3    ten days.  If you don't have the money to hire a lawyer to file

4    that notice of appeal for you, you would be entitled to a

5    lawyer free of charge.

6    Do you understand that?

7    THE DEFENDANT:  Yes, sir, I understand.

8    MR. KOHLER:  Judge, just so that -- I don't fully

9    understand what the sentence is.  I understand the three month,

10   Judge.  I understand the Salvation Army.  Is that a three-month

11   period of supervised release that you are ordering?

12   THE COURT:  No, I am not ordering supervised release.

13   I am ordering supervised release will be over when he serves

14   his sentence.  And that three-month period at the Salvation

15   Army is a part of his sentence.  It's an addition to the time

16   he spent in custody.

17   MR. DURKIN:  So you would be technically sentencing

18   him then to a 17-month sentence, 14 months in custody with

19   credit for time served.  He should be released forthwith.  And

20   the remainder --

21   THE COURT:  Out-patient --

22   MR. DURKIN:  -- of the sentenced to be served in

23   community confinement.

24   Is that right, Ms. Pruitt?

25   MS. PRUITT:  I believe so.  I mean, I'm not quite sure

1

2

3          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION

UNITED STATES OF AMERICA,        )   Docket No. 99 CR 43
                                 )
                Plaintiff,       )
                                 )
        v.                       )   Chicago, Illinois
                                 )   January 14, 2008
BERNARD J. O'HALLAREN, III,      )   1:00 o'clock p.m.
                                 )
                Defendant.       )

        TRANSCRIPT OF PROCEEDINGS - SHOW CAUSE HEARING
          BEFORE THE HONORABLE WILLIAM J. HIBBLER

APPEARANCES:

For the Government:          HON. PATRICK J. FITZGERALD
                             United States Attorney, by
                             MR. EDWARD G. KOHLER
                             Assistant United States Attorney
                             219 South Dearborn Street
                             Chicago, Illinois 60604

For the Defendant:           DURKIN & ROBERTS, by
                             MR. ANTHONY WILLIAM HILL
                             53 West Jackson Boulevard
                             Suite 615 60604
                             Chicago, Illinois 60604

Also Present:                MS. BOBBIE PRUITT
                             U.S. Probation Officer

              ALEXANDRA ROTH, CSR, RPR
              Official Court Reporter
              219 South Dearborn Street
                    Room 1224
              Chicago, Illinois 60604
                 (312) 294-0134



GOVERNMENT
EXHIBIT
E

1  objection to the government's motion.

2       THE COURT:  Okay.  So that, Mr. O'Hallaren, once you

3  complete that three months at the Salvation Army, that is the

4  period of your supervised release.  So you will have no other

5  attachments to the Court beyond that date.  And hopefully you

6  won't be standing before a Judge for anything criminal for the

7  rest of your life.  It's your opportunity to set about a

8  different path.

9       I hope that your relative remains well, and that you

10 will be there to spend some time with him.

11      THE DEFENDANT:  Your Honor, I thank you very much.

12 And sincerely I -- from -- on behalf of my father as well.  He

13 would want me to let you know that he appreciates everything

14 that you have done.  And I appreciate as well.

15      Thank you, sir.

16      THE COURT:  Well, I want to thank everyone for the

17 agreeable manner in which you were able to resolve this case.

18      MR. KOHLER:  Judge, may I ask a question?

19      THE COURT:  Yes.

20      MR. KOHLER:  I don't know the answer.  So it's more of

21 a question.  We discussed it just before you came out.

22      My assumption, Judge, is that the original sentencing

23 order in this case still stands and will stand in terms of the

24 restitution.  That's still due and owing to the extent that

25 it's due and owing.  If not, Judge, then I ask that whatever

1    that you are both satisfied with whatever amount is due, if

2    any, then --

3         MR. HILL:  I agree, Judge.  I am just concerned that I

4    don't -- I just want to have a hard and fast number so he knows

5    where he's at.

6         THE COURT:  Okay.  I am signing the order with regards

7    to the $1,200 that is being turned over to the government.

8         I think I did it yesterday, but, Mr. O'Hallaren, if

9    you at this time find that you feel there is a need to appeal

10   this order, you must do so within the statutory time frame.  If

11   you don't do so, you will lose your rights to any appeal.

12        Do you understand that?

13        THE DEFENDANT:  Yes, your Honor, I understand.

14        THE COURT:  Good luck to you, sir.

15        THE DEFENDANT:  Thank you very much, sir.

16        MR. KOHLER:  Thank you, Judge.

17        MS. PRUITT:  Thank you, your Honor.

18        MR. KOHLER:  Thanks to everyone.

19        (Which were all the proceedings had at the hearing of the

20        within cause on the day and date hereof.)

21

22

23

24

25